# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

OSWALDO CRUZ, et al.,

        Plaintiffs,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 08-5900 (MJD/JSM)

LAWSON SOFTWARE, INC.,
and LAWSON SOFTWARE
AMERICAS, INC.,

        Defendants.

Clayton D. Halunen, Shawn J. Wanta, and Susan M. Coler, Halunen &
Associates, and Christine E. Webber, Cohen Milstein Sellers & Toll PLLC,
Counsel for Plaintiffs.

Brian T. Benkstein, Ruth S. Marcott, and Sara Gullickson McGrane, Felhaber
Larson Fenlon & Vogt, PA, Counsel for Defendants.

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion for Decertification

[Docket No. 222] and on Defendants' Motions for Summary Judgment and

Dismissal [Docket No. 233].  The Court heard oral argument on November 12,

2010.

## II.   SUMMARY OF THE COURT'S OPINION

The Court grants Defendants' motion to decertify the FLSA class and

dismisses, without prejudice, the Opt-in Plaintiffs.  This matter is inappropriate

for collective adjudication because the consultants' jobs are unique, vary in

material ways, and are minimally supervised; multiple defenses are likely to

apply to some, but not all, consultants and will require fact-intensive inquiry;

and collective adjudication would be inefficient because representative testimony

would be inadequate.

The Court further grants summary judgment to Lawson on the basis that

all Named Plaintiffs fall under the administrative exemption.

## III.   BACKGROUND

### A.   Factual Background

Defendants Lawson Software, Inc. and Lawson Software Americas, Inc.

(collectively, "Lawson") develop enterprise resource planning software and sell

it to clients.  The software is developed to manage large-scale systems of clients,

such as Human Capital, Financial, and Supply Chain Management Systems.

Certain systems, such as Supply Chain Management, have separate versions for

the manufacturing and distribution industries and the service industries.

Lawson also sells consultant time to service Lawson products. It offers the services of Systems Consultants ("SCs"), Business Consultants ("BCs"), and Technical Consultants ("TCs"). Lawson consultants generally provide their services at client sites and are expected to travel approximately 80% of the time.

## B. Procedural Background

### 1. General Procedural Background

On May 20, 2008, Plaintiffs Oswaldo Cruz, Mary Martha Littlejohn, and Robert Greg Winn filed a Complaint against Defendants Lawson Software, Inc., and Lawson Software Americas, Inc. The Complaint was filed in the Southern District of New York. On October 28, 2008, the case was transferred to this District pursuant to 28 U.S.C. § 1404(a).

On January 2, 2009, Plaintiffs Cruz, Littlejohn, Winn, and Randall S. Preston filed an Amended Complaint against Defendants Lawson Software, Inc., and Lawson Software Americas, Inc. The Amended Complaint alleged: Count I: Violations of the Fair Labor Standards Act ("FLSA"); Count II: Violation of the Minnesota Fair Labor Standards Act ("MFLSA") Overtime Requirements; Count III: Violation of the MFLSA Record Keeping Requirement; Count IV: Violation of

ERISA § 502(a)(3) Failure to Maintain Records; Count V: Violation of ERISA § 1001, <u>et.</u> <u>seq.</u>; and Count VI: Unjust Enrichment.

On March 31, 2009, this Court conditionally certified the FLSA class, dismissed the ERISA counts, and denied the motion to dismiss the claim for unjust enrichment.

Defendants filed a Second Motion to Dismiss, seeking to dismiss Counts II and III of the Amended Complaint (the MFLSA claims) based on lack of standing because none of the named Plaintiffs had ever lived or worked in Minnesota. On May 21, 2009, the Court granted Defendants' motion. [Docket No. 114]

On July 9, 2009, Plaintiffs, plus new Minnesota-based Plaintiff Terry Roepke, filed a Second Amended Collective and Class Action Complaint ("Second Amended Complaint"). [Docket No. 149] The Second Amended Complaint alleges: Count I: Violations of the FLSA; Count II: Violation of the MFLSA Overtime Requirements; Count III: Violation of the MFLSA Record Keeping Requirement; and Count IV: Unjust Enrichment.

On January 5, 2010, the Court denied Plaintiffs' Motion for Class Certification of the state law claims under Federal Rule of Civil Procedure 23. [Docket No. 217]

Lawson now moves to decertify the FLSA class and for summary judgment on all claims against it.

### 2.    The Current FLSA Class

In its March 31, 2009 Order conditionally certifying the FLSA class, the Court ordered notice to "all persons employed by Lawson in the United States as Business Consultants, Systems Consultants, and Technical Consultants, or in substantially similar positions, from May 19, 2005 to the present."  (Mar. 31, 2009 Order at 36 [Docket No. 101].)

The conditionally certified class consists of the 5 named Plaintiffs and 62 opt-in plaintiffs.  Plaintiffs assert that they now seek to divide the class into three subclasses: a BC subclass consisting of 47 Plaintiffs; an SC subclass consisting of 12 Plaintiffs; and a TC subclass consisting of 9 Plaintiffs.  (Plaintiff Eckerson would be in both the SC and TC subclasses.)

On October 15, 2010, during the briefing on these motions, David Bogden withdrew his consent to opt into this case.

## IV.    DISCUSSION

### A.    Motion to Decertify

## 1.    Legal Standard

The Court performs a two-step process to determine whether a case should be certified under the FLSA:

> First, the court determines whether the class should be conditionally certified for notification and discovery purposes.  At this stage, the plaintiffs need only establish a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan.  In the second stage, which occurs after discovery is completed, the court conducts an inquiry into several factors, including the extent and consequences of disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that appear to be individual to each plaintiff, and other fairness and procedural considerations.

Dege v. Hutchinson Tech., Inc., Civil No. 06-3754 (DWF/RLE), 2007 WL 586787, at *1 (D. Minn. Feb. 22, 2007) (unpublished) (citations omitted).

In the first step,

> the Court only must determine whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are the victims of a single decision, policy, or plan.  The court does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage.

Id. at *2 (citations omitted).  This Court held that Plaintiffs met the first step when it issued its Order conditionally certifying the FLSA class on March 31, 2009.  This case is now at the second step.

At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives – i.e. the original plaintiffs – proceed to trial on their individual claims.

Carlson v. C.H. Robinson Worldwide, Inc., Civ. Nos. 02-3780 (JNE/JJG), 02-4261 (JNE/JJG), 2006 WL 2830015, at *3 (D. Minn. Sept. 26, 2006) (quoting Mooney v. Aramco Servs., Inc., 54 F.3d 1207, 1213-14 (5th Cir. 1995) (footnote omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)). The merits of the plaintiffs' claims are not considered at the decertification stage. Nerland v. Caribou Coffee Co., Inc., 564 F. Supp. 2d 1010, 1019 (D. Minn. 2007). The Court's decision regarding decertification is within its discretion. Id. at 1018. "Plaintiffs bear the burden of establishing that they are similarly situated." Id. (citation omitted).

### 2. Whether Plaintiffs Are Similarly Situated

#### a) Similarly Situated Standard

An action under the FLSA may be maintained against "any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

7

> At the second stage, the district court conducts a fact-intensive
> inquiry of several factors, including: (1) the extent and consequence
> of disparate factual and employment settings of the individual
> plaintiffs; (2) the various defenses available to defendant which
> appear to be individual to each plaintiff; and (3) fairness and
> procedural considerations.  Employees bear the burden of
> demonstrating that they are similarly situated.  Another question the
> Court considers is if Plaintiffs can demonstrate that the Defendant[ ]
> had a common policy or plan in violation of the FLSA that
> negatively impacted the original and opt-in Plaintiffs.

Burch v. Qwest Commc'ns Int'l, Inc., 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009)

(citations omitted).

### b)     Common Policy

Plaintiffs note that Lawson adopted one position description for each of

the three consultant positions at issue.  They claim that this weighs in favor of

collective determination.

The Court holds that, in this case, the common job descriptions do not

weigh in favor of classification.  As many Plaintiffs testified, Lawson's job

descriptions do not come close to "fully describ[ing] the scope of duties

performed by the [plaintiffs]."  Nerland, 564 F. Supp. 2d at 1020.  Moreover, the

job descriptions are so vague as to not be helpful to the FLSA analysis.  The

existence of these job descriptions does not eliminate the need for the Court to

conduct a detailed analysis of actual job duties.  See Smith v. Heartland Auto.

Servs. Inc., 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) (finding description not useful when plaintiffs "largely disavow reliance on the job description").

The Court further notes that the testimony of both Lawson witnesses and Plaintiffs shows that Plaintiffs' jobs were dissimilar, from whether they worked directly with clients to whether they worked on installations or attempting to fix failed installations. Consultants could not move to another consultant job: they could not move from one type of consultant job to another, such as from BC to TC or SC; nor could they move from one subject matter area to another, such as from being an HR BC to being a procurement consultant BC.

Plaintiffs also point to the fact that Lawson made one decision regarding exemption status for each group of consultants, rather than evaluating the consultants' job responsibilities on an individual basis, as evidence that collective determination is appropriate.

The classification process is not strong evidence when evaluating whether employees are similarly situated. See, e.g., Oetinger v. First Residential Mortg. Network, Inc., Civil Action No. 3:06-CV-381-H, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009) ("[Defendant]'s own classification is not at all determinative of the proper classification under FLSA. First, the employer's classification means little

compared to the employee's actual job duties and circumstances.  Moreover, an employee's classification as an administrative employee is a defense to a claim for unpaid overtime wages, not a basis for the cause of action under the FLSA.").

Also, in this case, the evidence shows that Lawson did conduct a thorough analysis to evaluate exemption status.  Compensation manager and compensation consultant Lisa Newman testified that exemption determinations were made each year.  Although consultants were already classified as exempt when Newman began working at Lawson, she still conducted an independent review to determine exemption status for each job class.  She made the exemption decision for BCs, TCs and SCs separately and also made the decision separately for each level of consultant – twelve decisions for each of three types of consultants at four different levels.  She reviewed the written job descriptions and, every year, she also conducted interviews of supervisors.  She considered position descriptions and talked with the Vice President of Services and some mangers.  In 2004 and 2005, Newman interviewed approximately 15 consultants from across the country regarding their roles.  Newman had personal knowledge of the consultants' jobs having worked side-by-side with several of them when they worked on HR software.

### c) Disparate Factual and Employment Settings

#### (1) SCs

Plaintiffs claim that both Plaintiffs and Lawson managers consistently describe SCs' primary job duty as installing or upgrading Lawson software products and training clients on those products. They also point to evidence that SCs follow installation guides provided by Lawson when doing installations and upgrades. They receive training regarding how to handle system administration functions with the software, such as setting up new users and setting security for the system. Plaintiffs conclude that SCs perform the same job functions, regardless of the particular project assignment.

In fact, the position description for SCs describes a wide variation of job duties. The use of installation guides does not make SCs job's uniform. In this case, there are more than one hundred installation guides. Additionally, SCs testified that they could not rely on those guides because the guides were often wrong or did not address the issues that arose.

#### (2) BCs

Plaintiffs assert that the BC's job duties are to configure Lawson software for the specific client and educate the client. These duties are broken down into stages, which are outlined in Lawson's StepWise methodology. BCs are trained

11

to follow Lawson's standard methodology.  Plaintiffs claim that the BCs do the same type of work whether they are configuring accounting software or setting up human resources software.

There is plentiful testimony regarding the differences among BCs and how a BC in one industry, such as HR, cannot work in a different industry, such as Finance.  Even two BCs in the same industry might work on different aspects of the same project.  Additionally, the use of the StepWise methodology does not result in a similarly situated class.  StepWise is a high level document that explains how to use Lawson's methodology; it does not instruct on how to do the daily tasks required.  Even so, not all consultants have passed the StepWise methodology certifications.  Other consultants do not even know what that methodology is.

As Practice Director Hollis Perreault testified, when BCs are at client sites, "no one else is going to double-check to make sure what they're recommending is correct; they don't get approval for it, it's their decision."  (Perreault Dep. 108.) Additionally, there is plentiful evidence that a BC's "function" is to be an analyst.

### (3)    TCs

Plaintiffs claim that TCs all work on customization or modification of Lawson software. They perform activities such as adding new features, developing the interface, converting data, building up new functionality that the software product currently does not have but is needed by the client, generating reports, and generating smart notifications. Technology services manager Scott Hanson testified that TCs also work "tweaking th[e] code." (Hanson Dep. 36.) Lawson provides software tools and utilities to the TCs to perform these tasks. TCs also work with clients to identify gaps between the way Lawson software is designed to work and the functions clients want to conform to their business processes. TCs then define the customizations needed to solve the problem. In order to create the customizations, TCs complete Lawson templates requesting the modifications and coordinate with programmers in Lawson's Manila office. Sometimes the Manila-based programmers write the programs, and sometimes, the TCS, themselves, write the code. In other cases, TCs use Lawson tools such as the Lawson Process Flow tool to build the system flow as the client wants it.

There is a material dispute regarding whether TCs regularly write computer programs. Multiple witnesses have testified that TCs regularly wrote computer programs. These witnesses included witnesses, such as Susan Neece,

who had worked as TCs and had, themselves, written code.  This dispute makes

collective adjudication impractical.  Moreover, although TCs do use templates to

complete their work, the referenced templates did not tell TCs how to write the

customization, but, instead, provided a blank format from which to work and

develop the report.

### (4)    Consultants in Different Levels and in Different Specialties

Plaintiffs argue that the four consultant levels (Associate, Standard, Senior,

and Principal) are not material to the Court's decertification decision.  Plaintiffs

assert that it is common for Lawson to send Standard level consultants on jobs

and bill them as Senior level consultants, and vice versa, and that there is little

distinction among the levels.  The Court disagrees.

There are consultants at all levels, including Associates and Principals,

who are participating in the case.  Additionally, while one level may occasionally

be substituted for another, the resource planner who assigns the consultants,

Diane Flaherty, testified that this only happens "minimally," when the right level

consultant is unavailable, and the client is informed and can accept or reject that

consultant.  (Flaherty Dep. 15-17.)

While Plaintiffs argue that there is little distinction between the levels of consultants, the testimony cited by Plaintiffs does not support their proposition. For instance, certain witnesses testified that higher levels had more responsibilities or that they had insufficient knowledge of higher levels and so, could not testify about their duties.

Furthermore, the evidence does not support Plaintiffs' conclusion that one consultant can simply replace another consultant at any place in a project. Instead, the testimony was that, within a team, one consultant may replace another when necessary.

While Plaintiffs claim that it makes no difference that consultants are assigned to different business areas, the evidence shows that, for example, for BCs, a BC's industry knowledge makes him or her successful as a consultant, so this experience cannot be discounted.

### (5)    Common Training

Plaintiffs argue that they are further similarly situated because all new consultants undergo the same orientation and basic training in topics such as an overview of Lawson, how assignments are made, and how schedules are communicated. All new consultants also receive training in Lawson's

implementation methodology, which provides a general project process followed by all Lawson employees, from the sales team through completion of a project.

SCs then receive weeks of additional training, which includes instruction for installing the software. SCs must receive certification from Lawson before they are sent to a client to install that particular software.

BCs also receive their own Lawson training and become certified on how to use and configure the various software packages sold by Lawson. They may be sent out to work on projects with other consultants before they are certified in order to gain practice experience working with the software. BCs are generally assigned to work with one major package of software, such as financial or HR, so their training will be completed with that specific software. Depending on the BCs' backgrounds, they may also take classes in communication skills.

Even assuming that undergoing similar training is a key fact in deciding decertification, Plaintiffs did not undergo similar training. While the very basic introduction to working at Lawson is the same for all Plaintiffs, the rest of the training received varies. Each job class has specific training for its consultants. There are 75 or so different intranet sites specific to industry type available to

consultants.  BC training takes a year or more.  And each BC training differs based on the particular employee and the product.

### (6)    Common Supervision

Plaintiffs argue that consultants are subject to the same system of supervision and work direction.  All consultants are subject to the direction of Resource Planners and Project Managers ("PMs").  The PM makes a request to the Resource Planner for the assignments of SCs, BCs, and TCs, as needed.  The PM for the particular project plans the project, provides logistical information to the consultants, and dictates travel and work schedules.  PMs act as the supervisors during the project, and consultants are required to follow their assignments and directions.

Consultants submit weekly status reports to the PM.  Time recorded by consultants must be approved by PMs before it is finalized.  Also, there is some evidence that the PMs are involved in communications with clients.  If a consultant needs additional assistance, he contacts the PM.  Plaintiffs conclude that Lawson subjected all consultants to the same mode of supervision.

The evidence shows that PMs divide the work, but they do not supervise the consultants' day-to-day activities.  The PMs do not monitor consultants'

work.  Their concern was completion of the work to stay within the project timeline.

The supervision of Plaintiffs is similar insofar as they all have a supervisor with whom they have almost no interaction or contact.  On most projects, they have a PM, with whom they generally have weekly contact, in the form of a status report from the consultant to the PM.  Additionally, generally, consultants might contact their PM from time to time for help on a particular issue, but, again, the contact was minimal.  On some projects the PM was on site, while on others, there was almost no contact.  Overall, the supervision structure is similar in that supervision is minimal.  This minimal supervision cuts against a finding that Plaintiffs are similarly situated.

## (7)    Differing Assignments

Many Plaintiffs performed different jobs and different job duties during the relevant period.  For example, Opt-in Plaintiff Craig Needham held three different jobs during the relevant time period: senior systems consultant, project lead, and systems consulting manager.  Needham acted as a manager for a period of time, working from home, but knew no other SC who worked as a manager.

BC Plaintiff Preston spent his first three months at Lawson on a development project as the "[s]ubject matter expert" on the project, "helping [Lawson] develop the rationale behind the Sarbanes Oxley and making sure [the beta product to track Sarbanes Oxley] worked." (Preston Dep. 19, 21.) BC Tamara Fox worked on the Talent Management HR product, the only BC working with product managers and developers on a module being developed, and testified that no other consultants at Lawson could do some of the work that she did. As another example, BC Charles Churchill was assigned to be a mentor and coach. Other BCs testified that they did no coaching. Churchill also delivered performance reviews. No other consultant testified to doing so.

The evidence shows that consultants are not interchangeable; they often cannot function outside their area of expertise, even having sub-specialties in particular products. There is testimony that consultants' daily work varies so much that they could not testify to a typical assignment. For example, BC Churchill could not give an estimate of how often he taught public training classes. He could not give a typical length for testing implementations because they vary so widely. The length of a project at a client's site could be one day, or it could be months.

Finally, different consultants also perform the same duty differently with regard to their exercise of discretion and the duties they perform. For example, when preparing materials for teaching courses, Churchill always followed the leader guide, while Preston wrote the Lawson Compliance Control Manager manual himself but did not use a manual when training because each client has different needs.

### 3.     Available Defenses

Another factor in favor of decertification is that Lawson has potential defenses that pertain to some, but not all individual Plaintiffs. See, e.g., Anderson v. Cagle's, 488 F.3d 945, 954 n.8 (11th Cir. 2007) (affirming decertification and noting that availability of defenses to some but not all of the putative class members posed "significant case management concerns"). Lawson relies on five FLSA exemptions to defend the FLSA claims: 1) administrative; 2) professional; 3) computer professional; 4) highly compensated employee; and 5) combination exemptions. The central trial issue would be whether Lawson properly classified Plaintiffs as exempt under one or more of these "white collar" exemptions.

The FLSA exemption analyses are based on each person's actual, "day-to-day activities and responsibilities." Keef v. M.A. Mortenson Co., No. 07-CV-3915(JMR/FLN), 2009 WL 465030, at *2 (D. Minn. Feb. 24, 2009) (citing Fife v. Harmon, 171 F.3d 1173, 1175 (8th Cir. 1999); 29 C.F.R. § 541). Therefore, the question of whether an exemption applies is "an intensely fact bound and case specific question." Id. (quoting Rutlin v. Prime Succession, Inc., 220 F.3d 737, 740 (6th Cir. 2000)). The jury will have to decide whether each Plaintiff engages in exempt work as his or her "primary duty" in light of "all the facts in a particular case." 29 C.F.R. §541.700(a). The jury will have to examine the relative importance of exempt duties, the amount of time spent performing exempt work, and the level at which the employee is subject to direct supervision. Id. In particular, the analysis of the computer professional, administrative, and highly compensated employee exemptions will require individualized inquiry.

### a) Computer Professional Exemption

Collective application of the computer professional exemption will be difficult because there is conflicting testimony regarding whether the TCs actually write computer code, which is critical to the analysis of this exemption. See 29 C.F.R. § 541.400.

### b) Administrative Exemption

The administrative exemption applies to employees whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. The regulations provide examples of the type of job duties that will satisfy the management or general business operations requirement, such as work in finance, accounting, and human resources. See 29 C.F.R. § 541.201(a)-(b).

The jury will need to assess each Plaintiff's level of discretion in carrying out the consulting work and whether it relates to matters of significance. This separate analysis "must be applied in light of all the facts involved in the particular employment situation." 29 C.F.R. §541.202(b). Factors that bear on this analysis include whether the employee had the authority to formulate, affect, interpret or implement management policies or practices, whether the employee carries out "major assignments" with regard to business operations; the extent to which the employee provides consultation or expert advice to management; and whether the employee investigates and resolves issues of significance. Id. These factors require consideration of each Plaintiff's unique employment situation, job

duties, and interactions with Lawson's customers.  Analysis on a collective basis

will be difficult because Plaintiffs have little supervision, interact with customers

in different manners, and give conflicting testimony regarding the extent to

which they independently solve problems versus follow an established Lawson

process to resolve issues.

### c) Highly Compensated Employee Exemption

Lawson also claims that the highly compensated employee exemption will

apply to the substantial number of Plaintiffs who earned more than $100,000 in

one or more years at Lawson.  Under this exemption, an employee with total

annual compensation of at least $100,000 is deemed exempt "if the employee

customarily and regularly performs any one or more of the exempt duties or

responsibilities of an . . . administrative employee."  29 C.F.R. § 541.601(a).  The

consultant's actual job duties will control this analysis.

### 4. Fairness and Procedural Considerations

In analyzing the fairness and procedural considerations, the Court looks to

the purposes of § 216(b) actions under the FLSA: "(1) reducing the burden on

plaintiffs through the pooling of resources, and (2) efficiently resolving common

issues of law and fact that arise from the same illegal conduct."  Morgan v.

Family Dollar Stores, Inc., 551 F.3d 1233, 1264 (11th Cir. 2008) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989)).

In this case, where Plaintiffs' duties and work performed vary significantly, the FLSA exemptions cannot be efficiently adjudicated en masse because the exemption analysis is fact-driven and Plaintiff-specific. See, e.g., Hernandez v. United Auto Credit Corp., No. C-08-03404 RMW, 2010 WL 1337702, at *5 (N.D. Cal. Apr. 2, 2010) ("It is difficult to see how a class action could proceed fairly and efficiently, given that each plaintiff's work situation will have to be examined to see what duties he or she performed. The potential for a class-wide ruling on liability seems slim."). The benefit of pooling Plaintiffs' resources is outweighed by the need for individual mini-trials in this case.

Even if Plaintiffs' subclass approach were applied, individualized analysis will be unavoidable: for example, within the BC subclass, there are 47 individual consultants whose job duties must be analyzed and measured against Lawson's multiple exemption defenses. This is particularly difficult because the representative testimony provided to the Court has not been consistent.

Individualized damages issues will also make class management complicated. Consultants testified that their written compensation plans

changed from year to year.  Consultants received a base salary and potential

incentive compensation based upon their utilization.  Even within the same time

period, consultants would have different compensation schemes.  BC Fox

testified that she had a different incentive plan than others when she started

working for Lawson because she was working on a new product.  Fox also billed

her travel time under administrative time, so there is a record of their travel time.

Other consultants never recorded travel time.

In certain cases in which plaintiffs will only recover nominal damages,

dismissal without prejudice is akin to a dismissal with prejudice.  However, in

this case, according to Plaintiffs' expert, some Opt-in Plaintiffs have damages in

the hundreds of thousands of dollars each.  There is a strong incentive for Opt-in

Plaintiffs to pursue individual claims.

### 5.    Conclusion

The Court hereby decertifies the FLSA class.  In this case, the consultants'

jobs were not cookie-cutter.  Although particular Plaintiffs testified that they

followed the Lawson method or a Lawson manual, when the rest of their

deposition excerpts are read, they generally show that consultants had to

problem solve, be creative, work collaboratively, or give advice.  The consultants

were not just following manuals: Plaintiffs, themselves, were clear that, in order to be successful, consultants need prior work experience in their particular industry; that SCs, BCs, and TCs cannot perform each other's jobs; and that a person cannot simply use the manual to install the software. While the consultants do follow manuals to do the installations, teach, and modify, the essence of their jobs is to consult, guide, and be flexible when simply following the manual is insufficient.

Moreover, many of the methods or forms Plaintiffs point to as standardizing consultant work are vague. The templates are blank building blocks and the StepWise methodology is a sequence and format of tasks, but provides no guidance on what the consultant is actually doing. While the installation guides are more detailed, many witnesses testified that they had to deviate from those guides on a regular basis.

Additionally, the common policy evidence is not strong. There are common job descriptions for each of the three types of consultants. However, the descriptions are so vague that they are not helpful to the FLSA analysis.

Nor does common training support Plaintiffs' cause. While the basic training on the Lawson methods and administrative items, such as expense

reports, is uniform, the evidence shows in-depth training that is different for not only each type of consultant but also for each area of expertise. The training is not uniform and it is extensive – BCs are trained over the course of a year. This militates against finding that Plaintiffs are similarly situated.

The application of the defenses will also cause problems to collective adjudication. For example, there is conflicting testimony regarding whether consultants wrote no code, some code, or a significant amount of code. This determination will be critical to the computer professional exemption defense. Similarly, there is materially different testimony regarding whether consultants were supervised at all, a little bit by telephone on other projects, or closely and directly supervised in person by the PM on still other projects. Some consultants mentored and coached, while others never did. Some consultants worked on developing and beta testing Lawson products, while others were expert troubleshooters. These differences may have significant impacts on the analyses of whether the consultants exercised discretion or worked on the general business operations of Lawson or its clients. Even if Plaintiffs were separated into three FLSA subclasses (SCs, BCs, and TCs) certification would be inappropriate.

In sum, Plaintiffs are not similarly situated and trial of their claims as a collective class would not be manageable. The FLSA class is decertified and the Opt-in Plaintiffs are dismissed from this case without prejudice. The Court now turns to Lawson's motion for summary judgment on the claims of the five remaining named Plaintiffs: Cruz, Littlejohn, Winn, Preston, and Roepke.

## B.    Motion for Summary Judgment

### 1.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### 2.    FLSA Unpaid Overtime Claims

The FLSA provides certain categories of employees who are exempt from overtime requirements. See 29 U.S.C. § 213. Here, Lawson asserts that the

following exemptions apply to the Named Plaintiffs: administrative,

professional, and combination.

> In an FLSA exemption analysis, the amount of time devoted to administrative duties, and the significance of those duties, present factual questions. The ultimate question, however, of whether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . governed by the pertinent regulations promulgated by the Wage and Hour Administrator.

Spinden v. GS Roofing Prods. Co., Inc., 94 F.3d 421, 426 (8th Cir. 1996) (citations

omitted). In other words, "[t]he question of how the [plaintiffs] spent their

working time . . . is a question of fact [and] [t]he question whether their

particular activities excluded them from the overtime benefits of the FLSA is a

question of law." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).

"The burden is on the employer to prove that th[e] exemption applies by

demonstrat[ing] that their employees fit plainly and unmistakably within the

exemption's terms and spirit." Spinden, 94 F.3d at 426 (citation omitted).

### 3.    Administrative Exemption

The wage and hour requirements of the FLSA do not apply to "any

employee in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1).

United States Department of Labor ("DOL") regulations define an administrative employee as someone:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The parties agree that the first element has been met – Plaintiffs were paid on a salaried basis of at least $455 per week. The employee's "primary duty" is the "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). "[A]n employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time." Spinden, 94 F.3d at 427 (citation omitted).

### a)      Work Directly Related to Management or General Business Operations

Current DOL regulations state that the exemption applies to employees whose work is directly related to "the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  This work is defined as "work directly related to assisting with the running or servicing of the business," as opposed to manufacturing production-line work or selling a product in a service or retail establishment.  29 C.F.R. § 541.201(a).

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

Id. § 541.201(b).

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

Id. § 541.201(c).

Plaintiffs' own testimony demonstrates that they are not production line workers but are, instead, consultants who advise Lawson clients on how to run their businesses using Lawson software. The evidence shows that Plaintiffs' work affects client operations to a substantial degree, and that Plaintiffs advise clients about how to configure and modify Lawson software to run their business.

Plaintiffs' work is explicitly aimed at improving or working on Lawson's clients' efficiency or mode of operation. Plaintiffs are consulting to assist in configuring the software in order to improve efficiency in whatever particular area they are working in for the client – HR, procurement, etc. In a case relied upon by Plaintiffs, Turner v. Human Genome Science, Inc., the court found that the defendants had not proven as a matter of law that the employees were exempt because the employees "were not members of a team whose job was to design, develop or implement any type of computerized information system supporting the work efforts of the researchers at HGS. . . . . Rather, [they] were simply the technicians who keep the company's overall computer and technological systems operating." 292 F. Supp. 2d 738, 745 (D. Md. 2003). In

contrast, here, Plaintiffs' job **is** to "design, develop or implement . . . [a] computerized information system supporting the work efforts of [the client]."

The Court rejects Plaintiffs' claim that this prong of the exemption requires employees to set company strategy; regulations and case law demonstrate that this definition is overly narrow. The DOL regulations explicitly state that the prong can apply to advisors or consultants to clients. The evidence shows that Plaintiffs' work is aimed at the overall efficiency or mode of operation of the Lawson customers – they are assisting in implementing and configuring Lawson software to run the client's business in a more efficient way, as opposed to just servicing an existing software system to make sure it functions, as an IT helpdesk employee would.

As for the series of computer cases cited by Plaintiffs, Plaintiffs are closer to problem solvers who might recommend that the client change certain business practices in order to work effectively with the new software, and participate in the design of client configurations, than to the IT workers who work to maintain a computer system or who perform routine installations. See, e.g., Koppinger v. Am. Interiors, Inc., 295 F. Supp. 2d 797, 802 (N.D. Ohio 2003) ("Plaintiff's deposition establishes that his position involved maintaining, upgrading, and

administrating the computer system.  While some of his work may be considered

manual in that he necessarily had to perform some physical actions (installing

hardware/software, etc.), those actions do not negate the exemption because

plaintiff's deposition testimony establishes the prominence of the problem-

solving, planning, and purchasing duties.  . . . .  Plaintiff's work, furthermore,

was comprehensive in nature, and ranged from investigating problems, to

considering possible solutions and implementing, in plaintiff's opinion, the best

solution.") (footnote and citation omitted); Paul v. One Touch Techs. Corp., No.

G037407, 2007 WL 1786259, at 4-*6 (Cal. Ct. App. June 21, 2007) (unpublished)

(holding administrative exemption applied to employee who acted as consultant

to employer's clients regarding development and configuration of software and

distinguishing DOL opinion letters because plaintiff "was engaged in testing and

configuring the software and modifying it so it could function in each unique

client environment [and] [t]his was more than manipulating predetermined

settings and specifications").

        **b)**       **Exercise of Discretion and Independent Judgment
with Respect to Matters of Significance**

For the administrative exemption to apply, Lawson must also show that

Plaintiffs' "primary duty includes the exercise of discretion and independent

judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).

> In general, the exercise of discretion and independent judgment
> involves the comparison and the evaluation of possible courses of
> conduct, and acting or making a decision after the various
> possibilities have been considered.  The term 'matters of
> significance' refers to the level of importance or consequence of the
> work performed.

29 C.F.R. § 541.202 (a).

> [T]he term 'discretion and independent judgment' does not require
> that the decisions made by an employee have a finality that goes
> with unlimited authority and a complete absence of review.  The
> decisions made as a result of the exercise of discretion and
> independent judgment may consist of recommendations for action
> rather than the actual taking of action.

29 C.F.R. § 541.202(c).  Final decision-making authority is not a prerequisite to a

finding of the exercise of discretion.  See, e.g., Dymond v. U.S. Postal Serv., 670

F.2d 93, 96 (8th Cir. 1982).  The discretion to make recommendations can suffice.

A consultant who implements her employer's software at a client and

assists the client with training, trouble shooting, and modifications can fall under

this prong, if the employee uses independent judgment in how to train and

address the client's problems with the software.  See, e.g., Verkuilen v.

<u>Mediabank</u>, No. 09 C 3527, 2010WL 3003860, at *1-*2 (N.D. Ill. July 27, 2010)

(holding that employee who provided service and support to customers who

bought her employer's software fell under administrative exemption and

concluding that she exercised discretion because "when confronted with a

client's problem in using [her employer]'s software, [the plaintiff] determined the

nature of the problem and how to handle it.  It is also undisputed that she

conducted training sessions and modified user manuals for clients. . . . .  Of

course, there were company policies for her to follow, but while her work was

channeled by these standards, she nonetheless possessed discretion and used

independent judgment in deciding how to address clients' problems with [her

employer]'s software and in training users of the software.").  Here, the evidence

shows that Plaintiffs similarly use independent judgment in how to train and

address the client's needs and problems with the software.  They are problem-

solvers for the clients.

     The Court rejects Plaintiffs' claim that the StepWise methodology and the

installation guides constrain their discretion.  An employee may still exercise

discretion and independent judgment although he or she is required to follow a

detailed company manual.  See McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1001 (8th Cir. 2003).

Here, the StepWise methodology does not contain detailed, step-by-step procedures outlining Plaintiffs' daily job duties, but rather, is a high-level guide. When an actual StepWise manual is examined, it is apparent that the StepWise system is a broad document setting forth the general steps to take and the form of the steps, but not the substance of what the consultant should actually do. This methodology is a consulting framework more than a how-to manual.

The installation guides are more specific than the StepWise methodology. However, Plaintiffs testified that they did not just follow these guides because bugs and unique situations regularly arose.  For example, Winn testified that he had to deviate from the guides because of an "infinite number of technical reasons."  (Winn Dep. 73-74.)

Additionally, Plaintiffs have little supervision.  They uniformly testified to almost nonexistent supervision by their direct supervisors.  On projects, the supervision was from the PM, and consultants are supposed to provide weekly status reports to the PMs.  However, Plaintiffs all testified that PMs did not directly observe them or even communicate on a regular, frequent basis.

Although Plaintiffs had to provide a weekly status report to a PM, had their work and work locations scheduled by Lawson, and were in occasional contact with their direct supervisor, there is no evidence of supervision of Plaintiffs' day-to-day work. Coupled with the lack of guidance as to the substance of Plaintiffs' problem-solving work, this lack of supervision shows that Lawson has met the second prong of the administrative exemption. See, e.g., Smith v. Johnson & Johnson, 593 F.3d 280, 285 (3d Cir. 2010) (holding that lack of oversight let to application of administrative exemption).

The Court now turns to each individual Named Plaintiff.

### c) Named Plaintiff BC Randall Preston

Preston performed work directly related to management or general business operations because he provided business and software consulting to Lawson's clients. For instance, Preston spent significant time working to create a new Lawson product to assist businesses in complying with Sarbanes-Oxley regulations. He was the "[s]ubject matter expert" who assisted Lawson "develop the rationale behind the Sarbanes Oxley and making sure it worked." (Preston Dep. 21.) He assisted the client in choosing the software and then worked on implementing the product at the Lawson client, still serving as the subject-matter

expert to ensure that the product was set up to satisfy the client's Sarbanes-Oxley requirements. The client followed his recommendations approximately 85% of the time.

Preston also performed consulting for other clients. For example, he guided an airline client through hundreds or thousands of variables which affected functionality and the client followed his advice about 60% of the time. Overall, Preston's testimony shows that he guided customers' decisions in setting up the manner in which certain aspects of their businesses would be run.

In his job, Preston exercised discretion by testing the functionality of software, and, if something was wrong, working with Lawson software developers to identify the root of the problem. Preston drew on his previous business experience when consulting, considering that knowledge to be critical to his success. He also considered himself to be a "thought leader" with regard to the development work he performed.

Finally, Preston worked independently. His supervisors gave him little to no direction and were not involved in his day-to-day work.

Taking the facts in the light most favorable to Preston, Preston's job falls squarely into the administrative exemption.

**d)     Named Plaintiff BC Mary Littlejohn**

Littlejohn guided clients through the process of learning how to use

Lawson software.  Littlejohn represents that her "primary duties included

developing business relationships with customers, designing and analyzing

software systems, customer training and customer service in implementing

products for Lawson's customers."  (Littlejohn Decl. ¶ 6.)  These tasks meet the

first prong of the administrative exemption.

Littlejohn exercised discretion on a regular basis.  She conducted business

process reviews with clients in order to understand their business needs and

then matched the clients' objectives with the capabilities of the Lawson

application.  Littlejohn testified that she frequently engaged in problem-solving

while advising clients.  If a client had a need that could not be met by a Lawson

product, Littlejohn's duty was to help the client address the gaps.  Clients paid

attention to her advice on how to address these issues.

Littlejohn performed her work with little or no direct supervision.

Taking the facts in the light most favorable to Littlejohn, Littlejohn's job

plainly falls into the administrative exemption.

**e)     Named Plaintiff SC Oswaldo Cruz**

Cruz meets the first prong of the administrative exemption because his primary job duties include software installation and problem solving for Lawson customers (in particular, Cruz would fix problems that other consultants could not solve), training, and knowledge transfers. Cruz's primary job duties were consulting and problem solving for Lawson's clients.

Cruz regularly exercised discretion when advising clients. He would address multiple variables and problems during the installation, so that "every installation is unique, never a dull moment." (Cruz Dep. 167-68.) He regularly had to deviate from the Lawson installation guides and use his industry knowledge, skill, and experience to read into the manual and figure out the problem. Cruz emphatically testified that one could not do his job by just following the instructions in the guides.

Cruz worked independently. He did not regularly communicate with his supervisor. He described his work as "[s]olo" without a supervisor or manager monitoring his performance. (Cruz Dep. 201.)

Taking the facts in the light most favorable to Cruz, Cruz's job is unmistakably subject to the administrative exemption.

**f)     Named Plaintiff SC Robert Greg Winn**

Winn's primary duties "included providing subject matter expertise and training to customers, and installing, maintaining and upgrading software and/or databases, operating systems, software, system administration, hardware configurations and networks in implementing products for Lawson's customers."  (Winn Decl. ¶ 6.)  Winn provided subject-matter expertise on Lawson's software for its clients system administrators – how to use and troubleshoot the software from an administrative standpoint, not from a user standpoint.  These duties meet the first prong of the administrative exemption.

Winn exercised discretion.  He testified that he would deviate from Lawson's installation guides for an "infinite number of technical reasons." (Winn Dep. 73-74.)  During an installation, there could also be an "infinite" number of configurations.  (Id. 24-25.)  Lawson would send Winn in to fix failed installs.  During implementations, Winn's duty would be to give advice to the client, and the client listened to his advice more often than not.

Winn worked independently with minimal supervision.  He only asked his supervisors for help on technical questions twice in his career at Lawson.  His supervisors did not come to the client site to observe his work, and he only communicated with them every couple of weeks.

Taking the facts in the light most favorable to Winn, Winn's job clearly falls into the administrative exemption.

### g)   Named Plaintiff BC Terry Roepke

Roepke was a BC who specialized in Lawson's financial application. Roepke's testimony emphasizes his problem solving duties and skills.  He was "a consultant hired by a client to deliver anything from financial application training to assisting them in implementing their application, or implementing the Lawson application within the framework of the procedures for their business, and testing of the application before it goes in."  (Roepke Dep. 17.)  These duties meet the first prong of the administrative exemption.

Roepke exercised discretion and independent judgment.  He had a special skill set that allowed him to overcome client issues that other Lawson consultants could not address.  He testified that his strong suit was to analyze problems and recommend the best solution.  He considered problem solving his strongest consulting set and loved solving seemingly impossible problems.  For example, on one project, Roepke worked with the developer to create a custom application to meet the client's needs in implementing the new software system for operating

its business.  This type of job task fits comfortably under the administrative

exemption.

Roepke worked independently.  For example, on one project, the PM "was

minimal to absent."  (Roepke Dep. 45.)  Roepke could not even remember the

name of his final supervisor at Lawson.

Taking the facts in the light most favorable to Roepke, Roepke's job falls

squarely into the administrative exemption.

### h)  Conclusion: Application of the Administrative Exemption to all Named Plaintiffs

Because the Court concludes that the administrative exemption applies to

all five named Plaintiffs, it need not reach the parties' arguments regarding the

applicability of other exemptions, such as the professional exemption, the

computer employee exemption, or the combination exemption.

### 4.  MFLSA Claims by Plaintiff Terry Roepke

Roepke brings claims for overtime violations (Count II) and recordkeeping

violations (Count III) under the MFLSA in addition to his federal FLSA claims.

(The remaining Named Plaintiffs are precluded from asserting an MFLSA claim

because they lack standing.  (See May 21, 2009 Order [Docket No. 114].))

The MFLSA's administrative exemption is analogous to the FLSA's administrative exemption. See Becker v. F & H Restaurant Group, Inc., 413 N.W.2d 202, 205 (Minn. Ct. App. 1987); see also Minn. R. 5200.0180. Therefore, for the reasons that the Court granted summary judgment on Roepke's FLSA claim, the Court grants summary judgment to Lawson on Roepke's MFLSA overtime claim.

The Court further dismisses Roepke's MFLSA recordkeeping claim because exempt employees are not covered by the recordkeeping statute. See Minn. Stat. § 177.30 (requiring employers to keep records of "employees"); Minn. Stat. § 177.23, subd. 7(6) ("[A]ny individual employed in a bona fide executive, administrative, professional capacity" is not an employee for the purposes of the statute.).

### 5. Claims for Unjust Enrichment by Named Plaintiffs

Lawson moves to dismiss the unjust enrichment claim because it is duplicative of Plaintiffs' FLSA claim, and, therefore, is preempted. In its March 31, 2009, Order [Docket No. 101], this Court held:

> The Court will allow the unjust enrichment claim to survive at least until discovery is conducted to determine the actual factual basis of the claim.

The Court denies the motion to dismiss the unjust enrichment claim based on Plaintiffs' right to plead in the alternative. FLSA preemption will only apply if the unjust enrichment has the same factual basis, so the Court will permit discovery before determining preemption.

(Id. at 19-20 (citations omitted).) Discovery has now closed, and Plaintiffs fail to

dispute that their unjust enrichment claim is based on anything other than

unpaid overtime. Therefore, the claim is preempted by the FLSA.


Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1. Defendants' Motion for Decertification [Docket No. 222] is **GRANTED** and the Opt-in Plaintiffs are **DISMISSED WITHOUT PREJUDICE**.

2. Defendants' Motions for Summary Judgment and Dismissal [Docket No. 233] is **GRANTED** and the Named Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  January 27, 2011              s/ Michael J. Davis
                                      Michael J. Davis
                                      Chief Judge
                                      United States District Court